IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 7, 2019

**STATE OF TENNESSEE v. RAYMOND WATISON**

**Appeal from the Criminal Court for Shelby County**
**No. 16-04907     James M. Lammey, Jr., Judge**

---

**No. W2018-00552-CCA-R3-CD**

---

The defendant, Raymond Watison, appeals his Shelby County Criminal Court jury conviction of first degree premediated murder, claiming that the trial court erred by denying his motion to suppress the statements he gave to the police following his arrest, that the trial court erred by admitting certain testimony in violation of evidence rule 404(b), that the trial court erred by permitting the State to admit the defendant's statements as rebuttal evidence, that the State knowingly presented false testimony, that the evidence was insufficient to support his conviction, that the prosecutor impermissibly misled the jury during closing argument, and that the cumulative effect of the errors deprived him of a fair trial. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, and D. KELLY THOMAS, JR., JJ., joined.

Raymond Watison, Clifton, Tennessee, pro se (on appeal); and James Jones, Bartlett, Tennessee (at trial), for the appellant, Raymond Watison.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Ryan Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Shelby County Grand Jury charged the defendant with first degree premediated murder for the June 1, 2016 death of the victim, Juan Jackson.

At the January 2018 trial, the victim's aunt, Regina Blakly, testified that the victim had been diagnosed with schizophrenia and bipolar disorder.

The victim's cousin, Dontray Robertson, testified that, at the time of the murder, the victim lived with him at 1233 Tahoe. The victim had mental health issues that Mr. Robertson described as "[s]chizophrenic, brain injury type stuff." Mr. Robertson recalled that, several weeks before the murder, the victim told Mr. Robertson that he and the defendant "had some conflict" over "some pizza or something" at the neighborhood grocery store. Mr. Robertson drove the victim back to the store but made the victim stay in the car while Mr. Robertson went in and spoke with the defendant. Mr. Robertson said that he told the defendant about the victim's mental health issues and that, "whatever [the victim] said, it don't mean nothing because he talking just to be talking." Mr. Robertson recalled that the defendant said "[t]hat was cool, okay, he understand that he had a problem, so that squashed it."

A couple of weeks later, however, the defendant "showed up across the street from [Mr. Robertson's] house with a gun." Mr. Robertson said that he was in the restroom when the victim "came running into the house" frantically "beating on [the] restroom door" and yelling at Mr. Robertson, who was in the shower. When Mr. Robertson came outside, he saw the defendant "standing across the street by his car" holding what appeared to be a .22 revolver "down to his side." The defendant was speaking, but Mr. Robertson could not recall what he was saying. Mr. Robertson said that he "told [the defendant] we don't need that around here," and the defendant "got in his car and left."

During cross-examination, Mr. Robertson said that he did not recall the victim's calling the police in May 2015 to report that he wanted to stab Mr. Robertson's wife. Mr. Robertson said that he did not know whether the victim had threatened the defendant at the grocery store and that he went to the store to mitigate the "beef" between the two men. Mr. Robertson said that the defendant did not brandish the gun or point it at either him or the victim.

Tierra Patterson testified that, in June 2016, she and the defendant were romantically involved. At that time, the defendant worked at the corner grocery store, Royal King, cooking fast food and cleaning the store. On June 1, 2016, the couple went to the defendant's mother's house, where they visited with his mother for approximately two hours, and then drove to the Royal King in Ms. Patterson's silver Cadillac STS. Ms. Patterson said that she sat inside the car for approximately two hours while the defendant came and went from inside the store. Ms. Patterson recalled that after leaving the Royal King, they drove to the defendant's mother's house a second time, and Ms. Patterson went inside the defendant's mother's house while the defendant went inside a nearby house.

-2-

Ms. Patterson testified that when he next returned to her car, the defendant had a shotgun with blue tape on it. They then drove down Tahoe "to see his cousin's friends." While visiting with the friends of the defendant's cousin, Ms. Patterson heard the defendant say that he was going to kill someone, but she did not know who. She said that when she heard the defendant's discussing killing someone, she asked him to take her home. They got into her car and began driving toward her apartment. Ms. Patterson recalled that when the defendant turned the car onto Raines, he "said there he go right there." The defendant immediately turned the car around and drove back down Tahoe. He parked Ms. Patterson's car in front of an abandoned house and got out of the car. Ms. Patterson said that she heard gunshots just before the defendant returned to her car. Ms. Patterson said that she was scared because her brother had recently been murdered and because the defendant had threatened to kill her if she told anyone what he had done.

Ms. Patterson testified that after the shooting, they returned to the defendant's mother's house, and she sat in the car while the defendant went inside to change clothes. The defendant returned to the car and drove back to the scene. The defendant parked the car on Raines and got out, but Ms. Patterson remained. She said that, later that evening, she was detained by the police and taken to the police department for questioning. Upon questioning by the police, Ms. Patterson provided a statement implicating the defendant in the victim's murder. She also identified the defendant from a photographic array, writing on the array, "I saw him murder the guy that died on Tahoe Street."

During cross-examination, Ms. Patterson said that the defendant "hid behind a tree. When the victim came around, he shot him." Ms. Patterson said that she did not ask the defendant why he had retrieved the gun because she was afraid of him. She also did not ask him to take her home after the murder because she did not "want him to take his problems out on" her. She said that she never heard the defendant say why he wanted to kill the victim. Ms. Patterson said that she did not recall telling the defense investigator that the victim had fired a gun at the defendant at least twice. She also denied having communicated with the defendant after his arrest but admitted that she had communicated with his mother.

Memphis Police Department ("MPD") Patrol Officer Matthew Charles responded to a call of shots fired on Tahoe. When he arrived on the scene at approximately 9:30 p.m., he observed the victim lying in "the ditch where the sidewalk meets the asphalt" with an obvious gunshot wound to his face. Officer Charles called for an ambulance and backup to secure and process the scene.

MPD Crime Scene Investigator Sergeant Demar Wells responded to the scene and found the victim lying face down "near the south curb" of Tahoe; he had

-3-

"sustained extensive injury from a possible gunshot." The victim also had what appeared to be a gunshot wound to his right buttock. Sergeant Wells took photographs of the scene and collected evidence, including "one spent 12 ga[u]ge Winchester casing and one plastic cigarette lighter." Sergeant Wells also took photographs of a vehicle parked on West Raines approximately 100 feet from the body.

MPD Officer Jaboa Childs also responded to the scene. Officer Childs recalled that while officers were securing the crime scene, a black male "subject approached the crime scene tape and advised that he needed to get inside the crime scene to pick up family members." Officer Childs told the man, later identified as the defendant, that he could not enter the scene during the active investigation and "that he had to stay out and wait until we was done." The defendant did not stop and instead "kept trying to get into the scene." Officer Childs said that the defendant eventually left but returned later saying "that he wanted to go and pick up family members from a house that was inside of the crime scene tape."

Officer Childs testified that she participated in the defendant's arrest later that evening. Officer Childs also spoke to the defendant's female companion, who indicated that she and the defendant had arrived at the scene in her silver Cadillac. Officer Childs walked over to the vehicle and saw "two red gunshot shells in the back seat."

MPD Officer Michael Coburn executed a search of a 2004 silver Cadillac in "the tunnel," a warehouse used by the MPD to search vehicles. A wallet discovered inside the car contained items that belonged to the defendant. In the backseat, he found two "live 12 gauge slug[s]" and "a white bag [that] contained [five] 12 gauge slugs." Inside the trunk, Officer Coburn found "a blanket or something covering the object in there." He unwound the blanket and found "a shotgun with blue tape around it" and a spent casing in the chamber.

Tennessee Bureau of Investigation ("TBI") Special Agent and Forensic Scientist Cervinia Braswell testified as an expert in firearms identification. Agent Braswell said that she examined a sawed-off pump shotgun, two fired shotgun shells, some unfired shotgun shells, and three fired slugs in association with this case. The shotgun was capable of holding three shells, two in the magazine and one in the chamber. As a result of her examination, she determined that the shotgun shell collected from the crime scene had been fired from the sawed-off shotgun collected from the trunk of the silver Cadillac, as was the other spent shell collected from the shotgun itself. She also examined lead slug fragments collected during the autopsy of the victim and determined that the slugs were "consistent with the one-ounce slug that's loaded into the live cartridges" that were found inside the Cadillac. She recalled that one of the slug

-4-

fragments collected during the victim's autopsy "also contained a fiber wad," which was "indicative of the gun being fired close to the target."

Doctor Erica Curry performed the autopsy of the victim. The victim suffered a gunshot wound to "the left side of his face incorporating his left ear" and one to his left leg. The shotgun wound to the victim's face entered on the left side of his head and exited "on the right side of his mouth, right jaw area," traveling "left to right and slightly downward." She opined that a wound on the victim's right shoulder occurred as a result of the slug's having traveled through the victim's head and into his shoulder. The gunshot to the victim's left leg entered the upper thigh and "exited on the left buttock," traveling "left to right, front to back and upwards." Doctor Curry recovered slug fragments from the victim's right shoulder and the "exit wound that was on the buttock." She also recovered "a slug and portion of a wad . . . from the left hip." During the autopsy, Doctor Curry discovered two plates on the victim's skull that were "evidence of him having previous brain surgery."

Following this testimony, the State rested. The defendant chose not to testify but elected to present proof.

Rachel Geiser, a private investigator employed by the Public Defender's office, testified that she interviewed Ms. Patterson on June 29, 2016. In a recorded statement taken during the interview, Ms. Patterson maintained that the victim had threatened to kill the defendant and had fired at the defendant first.

During cross-examination, Ms. Geiser admitted that Ms. Patterson told Ms. Geiser that she had not given a statement to the police. Ms. Geiser said that she was not aware that Ms. Patterson provided the statement to her only one hour after speaking to the defendant.

MPD Officer Erik Mettler testified that in May 2015 he responded to "a mental consumer call" placed by the victim. When Officer Mettler arrived, the victim told him that "he had been in a verbal altercation with his cousin's wife and that she was putting him out of the residence" and that "he called [the MPD] because he might want to hurt her." When asked whether he had any knives or weapons, the victim's "response was that if I had a knife, I would stab somebody." Officer Mettler said that he had responded to four or five other similar calls placed by the victim.

During cross-examination, Officer Mettler said that he had never had to fight the victim, had never made the scene where the victim had actually injured anyone, and had never made the scene when the victim had harmed himself. Officer Mettler said that he had never actually seen any evidence that the victim was homicidal or suicidal

-5-

and that he transported the victim for an evaluation only because it was MPD policy to "transport if someone says they're homicidal or suicidal." Officer Mettler recalled that when he responded in May 2015, the victim himself had placed the call and that there were no others present in the residence.

MPD Officer Gregory Turner responded on Christmas day 2015 when the victim "called his self about disturbing the household" because someone was misusing his debit card. Officer Turner said that the victim, who was classified "as a mental health consumer," told Officer Turner that "whoever was doing it . . . he was going to kill them. He didn't specify who. He said them."

During cross-examination, Officer Turner acknowledged that the victim "was never combative with the police," and Officer Turner "had never made a call where [the victim had] assaulted anybody else." Officer Turner recalled that the MPD did not investigate the victim's claim of a stolen debit card because it was "determined that he was probably . . . having a mental episode."

Retired MPD Officer William Teal responded to a May 7, 2016 call placed by the victim wherein the victim claimed that he "wanted to kill somebody" but provided no specific person.

During cross-examination, Officer Teal recalled that, on that occasion, the victim initially reported that he was suicidal because of text messages he had received and then later said that he wanted to kill somebody. Officer Teal said that he had never seen the victim with a weapon.

The defense rested, and the State chose to present rebuttal proof.

In rebuttal, Ms. Patterson testified that the victim did not fire any shots at her or the defendant before the defendant shot him. Ms. Patterson acknowledged that her recorded statement to Ms. Geiser was inconsistent with her earlier testimony. She explained:

> I told the investigator that story because she let me know that she was a private investigator for Raymond Watison, and I was afraid. I didn't want him to find out that I was making statements to the police and calling, threatening my phone or sending people to my house to threaten me.

Ms. Patterson also testified that, despite having testified otherwise earlier, she had communicated with the defendant by telephone after the murder. She insisted, however,

that they "didn't talk about the case." She said that she was nervous during her earlier testimony because the defendant "was sitting right there" and because she did not "want to be around him." Ms. Patterson recalled that the last thing the defendant said to her was that he would kill her if she told anyone that he had killed the victim. Additionally, several other people had contacted her to tell her not to testify against the defendant.

The State played for the jury several recorded telephone conversations between the defendant and Ms. Patterson following the defendant's arrest, including one that occurred right before Ms. Patterson gave the statement to Ms. Geiser.

MPD Detective Miranda Jones testified that she interviewed the defendant following his arrest. After waiving his constitutional rights, the defendant gave a five-page statement in the early morning hours of June 2, 2016. In that initial statement, the defendant denied having murdered the victim and instead said that a man he knew only as "Hurt" had murdered the victim. The defendant gave a physical description of Hurt and said that Hurt lived at 910 Pawnee Street. The defendant said that he and Ms. Patterson had picked Hurt up in Ms. Patterson's car "to go to his woman's house to do his dirty laundry" and that Hurt had put a 12 gauge shotgun into the car along with his dirty clothes. The defendant and Ms. Patterson took Hurt to the store to buy cigarettes, and on the way back, "some dude in the all black Hurt was talking about I'm going to smoke him." At that point, the defendant claimed that he and Ms. Patterson kicked Hurt out of the car and drove to the Royal King. The defendant said that they returned to the scene when they heard sirens 15 to 20 minutes later. The defendant claimed the victim owed Hurt money for marijuana. The defendant said that the victim had previously gotten angry with the defendant for burning his pizza.

Detective Jones testified that, after the defendant gave this statement, she attempted to locate the individual known as "Hurt" but was unable to do so. She recalled that she developed a photographic array of individuals known to have the nickname of Hurt, but the defendant was unable to identify anyone from that array.

After she was unable to locate or further identify Hurt, Detective Jones spoke with the investigator who had interviewed Ms. Patterson and learned that Ms. Patterson's statement conflicted with the defendant's. Detective Jones then conducted a second interview of the defendant. In his second statement, the defendant said that he saw the victim as he was leaving the Tahoe Street residence of his friends. He said that he saw

> this dude with all black walking on the right side of the street.
> As he was merging off the bush tree, it looked like he was
> reaching for something from the right side and I thought it

was a gun. He went back into the bushes and I stopped the
car and let Tierra's window down and I told dude to stop
playing with guns. I said stop playing with guns. I'm going
to teach you a lesson.

The defendant claimed that the victim "flashed a gun out," so the defendant "got out of
the car" and "kept telling that boy to go home. But he wouldn't listen and go home and
kept running off at the mouth." The defendant told Detective Jones that, at that point, the
defendant "let that one shot off, but . . . didn't aim it at him." He said that he then got
back into the car, instructed Ms. Patterson to "pull off and meet me around the corner."
She did so, and the defendant "fired the second shot and hit him." The defendant insisted
that, despite having blown away half of the victim's face, he only intended to scare the
victim.

Following this evidence, the State rested again, and the defendant again
elected not to testify and chose to present no further proof.

Based upon this evidence, the jury convicted the defendant as charged, and
the trial court imposed a sentence of life imprisonment.

The defendant filed a timely but unsuccessful motion for new trial.
Following the denial of his motion for new trial, the defendant expressed his desire to
proceed pro se without the assistance of elbow counsel, and, after a hearing on the matter,
the trial court permitted the defendant's attorney to withdraw. The defendant filed a
timely, pro se notice of appeal.

In this appeal, the defendant asserts that the trial court should have
suppressed both statements he gave to the police, arguing that they were the product of an
illegal arrest and coercion by the police. He also argues that the trial court should not
have permitted Mr. Robertson to testify about the defendant's having threatened the
victim with a gun in violation of evidence rule 404(b) and should not have permitted the
State to publish his statements to the jury during rebuttal. He claims that the State
allowed Ms. Patterson to present false testimony and failed to correct the falsity and that
the prosecutor engaged in prosecutorial misconduct by making improper comments
during closing argument. He also challenges the sufficiency of the convicting evidence.
Finally, he asserts that the cumulative effect of the errors deprived him of the right to a
fair trial.

*I. Suppression*

Prior to trial, the defendant moved the trial court to suppress both statements he provided to the police following his arrest, claiming that the State lacked probable cause to arrest him and that, as a result, both statements were the product of an unconstitutional arrest.

At the hearing on the motion to suppress, Officer Childs testified that on June 1, 2016, she responded to a shooting in the area of 1207 Tahoe. When she arrived, she saw a "[m]ale subject down with apparent gunshot wound to the face." She observed what she believed to be red shotgun shells near the body. She recalled that her supervisor, Lieutenant Lorenzo Young, arrived approximately five minutes later. While the officers were processing the scene, "[o]ne witness called or phoned in to" Lieutenant Young "while on the scene."

While securing the scene, Officer Childs "had a confrontation with an individual who was advising [her] that he needed to get back into the crime scene." Officer Childs told the man that no one would be allowed inside the crime scene, and the man left after "words were exchanged" only to return later. Officer Childs recalled that approximately 20 onlookers had arrived at the scene, but only one individual tried to enter the crime scene.

At some point after Officer Childs's initial interaction with the man, Lieutenant Young showed Officer Childs a photograph on his telephone. She immediately recognized the individual in the photograph as the same man who had been attempting to enter the crime scene and the same one who was, at that point, "huddling, basically, right on the tape" surrounding the scene. She alerted her supervisor and "showed several other officers who all agreed." At that point, the officers asked the man "to come into the crime scene, that way we can detain him."

Officers also detained the woman who was accompanying the man. The woman said that she and the man had driven back to the scene and "pointed out the car that she was in," which was parked approximately 20 feet away. Officers went to the car, a silver four-door Cadillac, and looked in the windows. They saw "the same shell casing that was on the scene in the back seat of the car that they both got out of." Officer Childs reported the finding to homicide detectives who had arrived on the scene. Detectives instructed Officer Childs to secure the vehicle by standing next to it until the truck arrived to tow the vehicle "to the tunnel," which is "where they tow vehicles for evidence to search -- to get a search warrant."

-9-

During cross-examination, Officer Childs said that the man insisted that he needed to access the crime scene so he could go get his children from a house that was cut off by crime scene tape. Officer Childs said that the defendant "was placed into custody before being transported to 201 Poplar," "after the photo was presented and he was identified." She described the photograph displayed to her by Lieutenant Young as "the picture that we get when we run driver license." Officer Childs acknowledged that she never spoke to the person who provided the picture and that she did not know whether the person who had provided the photograph was also present at the scene.

MPD Lieutenant Lorenzo Young testified that when he arrived on the scene, he observed a man with a shotgun wound to the face and shotgun shells next to his body. Lieutenant Young recalled that several people on the scene who knew him were just making general conversation with him when he "was told at that time, from people who were speaking to me, that they witnessed the shooting and they could probably give me a name, they just needed a few minutes." One individual, whom Lieutenant Young described as "a very close friend," found the suspect's "Facebook page and text[ed] his Facebook page with a picture of him and his name" to Lieutenant Young. Lieutenant Young said that his friend did not actually witness the shooting but was visiting people in that area who said that they had witnessed the shooting. The individuals who witnessed the shooting "said they absolutely did not want to be involved because they still have to live in that community." He said that, in his 21-year police career, he had encountered that sentiment routinely.

Lieutenant Young shared the information he received with the officers on the scene. When Officer Childs saw the photograph, she told him that the man in the photograph appeared to be the same man who was "creating a disturbance at the crime scene tape." Lieutenant Young instructed Officer Childs to detain the man. Lieutenant Young learned from other officers that the man had arrived at the scene in a vehicle that was still parked nearby. When Lieutenant Young looked inside the vehicle, he saw shell casings that matched those near the victim's body.

During cross-examination, Lieutenant Young reiterated that the individuals who identified the defendant wanted to remain anonymous, so Lieutenant Young did not ask for their names and did not provide the name of his friend to the State. He said that the photograph he showed to the other officers was not a driver's license photo but was instead a photo from Facebook. Lieutenant Young did not save the text message that contained the photograph and, to his knowledge, never provided a copy of the message to any other person.

During redirect examination, Lieutenant Young clarified that when his friend originally gave him the information, Lieutenant Young did not know about the

confrontation at the crime scene tape, so he told his friend "to go ahead and call this in as a Crime Stopper tip." Lieutenant Young identified one of a series of photographs provided along with a crime stopper tip as the Facebook photo that he had received via text message and then displayed to other officers at the scene. In the photograph, the defendant was wearing a plaid shirt and had his arms folded.

MPD Detective Miranda Jones testified that she responded to the scene and, at one point, observed the defendant "trying to enter the crime scene." After the defendant was transported to the justice center, she interviewed him in "a standard room, no windows, with a bench, table, chalk board." She recalled that there was "a fan in the hallway, like in the doorway," which was turned on when the defendant was allowed to have a cigarette as a way to rid the room of smoke. Detective Jones provided the defendant with *Miranda* warnings, and the defendant agreed to waive his rights at 3:05 a.m. After signing a written rights waiver form, the defendant provided a statement that was typed by Detective Jones. The defendant then signed the statement acknowledging its truth. Approximately five hours later, the defendant gave another statement after having again been advised of his constitutional rights. In that statement, the defendant stated that he had shot the victim in self-defense.

Detective Jones testified that the defendant did not appear to be under the influence of drugs or alcohol. The defendant did not at any point indicate that he wanted to remain silent or that he wanted the services of a lawyer. She said that the defendant did not appear stressed, and the police honored his requests to use the restroom, have food and drink, and smoke a cigarette. She maintained that he was not threatened or promised leniency in exchange for making a statement.

During cross-examination, Detective Jones acknowledged that by the time the defendant gave the second statement, he had been detained for nearly 12 hours. During the time between the two statements, the defendant was held in the interrogation room and shackled to the chair by a single leg iron.

During redirect examination, Detective Jones said that, between the two interviews of the defendant, she and other officers spent time trying to identify "Hurt," the man that the defendant claimed had shot the victim. She decided to interview the defendant a second time after learning that the statement provided by his female companion did not match the one given by the defendant.

The defendant presented the testimony of Angela Baker, an investigator with the Shelby County Medical Examiner's Office, who testified that her role in the case was "strictly concerning the body." Ms. Baker responded to the scene and took a brief history from the officers there. She then examined the body, she took pictures, and then

she left to do a written report. Ms. Baker said that although her report indicated that she had been briefed by Lieutenant Young, she could not recall any particular officer who briefed her in this case. Instead, she said, even though Lieutenant Young was listed as the primary informant, other officers would have been there providing her with information. She acknowledged that her report indicated that officers had no witnesses to the shooting at that time.

During cross-examination, Ms. Baker testified that her report was "our internal report" that was meant only to provide Ms. Baker's "take on the scene and the story to convey to the medical examiner of what the scene was like. It's not meant to be a blow by blow."

At the conclusion of the proof, the trial court denied the defendant's motion to suppress the statements he gave to Detective Jones, finding that, based upon the evidence presented, there was no proof that the defendant's statement was coerced. The court concluded that the officers had probable cause to detain the defendant, stating, "To say that they didn't have a right to detain him is absolutely asinine . . . ." The court summarized the facts supporting a finding of probable cause: "They took him into custody after they saw the photograph of him, this is the guy that did it, oh he's the guy trying to get through the crime scene, he's the guy that has the shotgun shell in his car that matches the one on the ground." The court observed that the defendant's arrest was not illegal because probable cause existed at the time he was taken into custody and, in response to the defendant's argument, determined that the failure to memorialize those things in writing in the various reports provided to the defendant during discovery did not affect that finding. The court observed that even if "the recording of the basis for probable cause was recorded days after," "[t]he probable cause was established at the scene." The court also found that the statements "appear to be voluntary."

The defendant challenges the ruling of the trial court, reiterating that probable cause for his arrest was presented only after the fact, rendering his arrest illegal and both statements unconstitutional.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

-12-

*A. Probable Cause*

We consider first the defendant's claim that the police lacked probable cause to arrest him at the scene.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010) (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). "One of the narrowly defined exceptions to the warrant requirement is met when a police officer has probable cause to believe that the suspect has committed, is committing, or is about to commit a criminal offense." *State v. Davis*, 484 S.W.3d 138, 143 (Tenn. 2016) (citing *State v. Echols*, 382 S.W.3d 266, 277-78 (Tenn. 2012)); *see also* T.C.A. § 40-7-103(a)(1).

> Probable cause exists when "at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." It requires "more than a mere suspicion." Instead, a probable cause inquiry focuses on probabilities rather than technicalities and is grounded in the factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act.

*Davis*, 484 S.W.3d at 143 (citations omitted). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

The evidence adduced at the suppression hearing established that, shortly after arriving on the scene, Lieutenant Young was approached by individuals, including a close personal friend of his, who indicated "that they witnessed the shooting and they could probably give [him] a name, they just needed a few minutes." Shortly thereafter, Lieutenant Young's friend texted him a Facebook photograph of the person they had seen shoot the victim. At that same time, the defendant had returned and attempted to reenter the crime scene. He left after a confrontation with Officer Childs but returned later and was "huddling, basically, right on the tape" surrounding the scene when Lieutenant

Young showed the photograph on his cellular telephone to Officer Childs. Officer Childs immediately identified the person in the photograph as the same person who had created the earlier disturbance by trying to enter the crime scene. The officers detained the defendant inside the crime scene, and, after observing shotgun shells matching the one found near the victim's body inside the car that the defendant had used to travel to the crime scene, he was arrested and transported to the police department for questioning. In our view, the defendant's peculiar behavior, his identification as the shooter by witnesses who provided his photograph to the police, and the presence of the shotgun shells inside Ms. Patterson's Cadillac amounted to probable cause to arrest him for murdering the victim.

As to the defendant's claim that Lieutenant Young lied about seeing his Facebook photograph, we note that the trial court, who saw and heard the witness firsthand, specifically accredited Lieutenant Young's testimony. As to the defendant's claim that he did not even have a Facebook page, we would note that no evidence in the record supports the defendant's claim.

### B. Miranda

The defendant also argues that the trial court should have suppressed his statements because he did not voluntarily waive his constitutional rights.

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). In *Miranda*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* To safeguard the privilege against self-incrimination, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent,

the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

*Id.* at 473-74.

A statement made "during a custodial interrogation is inadmissible at trial unless" the State can establish a knowing and voluntary waiver of the *Miranda* rights. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). "[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda*, 384 U.S. at 475. "The State bears the burden of establishing 'waiver by a preponderance of the evidence.'" *State v. Climer*, 400 S.W.3d 537, 564 (Tenn. 2013) (quoting *Berghuis*, 560 U.S. at 384). Although the State need not "show that a waiver of *Miranda* rights was express," the giving of an uncoerced statement following the provision of *Miranda* warnings, "standing alone, is insufficient to demonstrate 'a valid waiver.'" *Climer*, 400 S.W.3d at 564 (quoting *Miranda*, 384 U.S. at 475).

The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*Berghuis*, 560 U.S. at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *see also Climer*, 400 S.W.3d at 564-65.

-15-

Here, the evidence established that the defendant was arrested based upon probable cause that he had shot and killed the victim. He was taken to the police station and placed in an interrogation room to await questioning. When Detective Jones arrived to question the defendant, she provided him with *Miranda* warnings and provided him with a written rights waiver form, which the defendant signed before providing his first statement. Detective Jones testified that the defendant did not appear to be under the influence of drugs or alcohol or otherwise impaired in any way that might prevent his waiving his rights. He was provided with food, drink, and cigarettes as he waited in the interview room. Before interviewing the defendant a second time, Detective Jones again provided the defendant with *Miranda* warnings. No evidence suggests that the defendant's decision to waive his constitutional rights was anything other than voluntary. Indeed, the evidence establishes that the defendant's decision was "voluntary in the sense that it was the product of a free and deliberate choice" and that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421.

## C. Voluntariness

Finally, the defendant contends that the trial court should have suppressed his statements because they were not voluntarily given and were instead the product of coercion.

Both the federal and state constitutions protect the criminally accused from compulsory self-incrimination. *see* U.S. Const. amend. V; Tenn. Const. art. I, § 9. To pass constitutional muster and be admissible at trial, a confession must be free and voluntary and not "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) ("The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely

self-determined.'" (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted))).

The defendant asserts that his statements were not voluntary because he was sleep deprived, placed in front of a fan, and not represented by counsel. The record establishes that the defendant was arrested at the scene, where he remained for approximately two hours before being transported to the police station for questioning. At the station, he was placed in a standard interrogation room and shackled to a chair by a single leg iron. He was given food and drink and was even permitted to smoke cigarettes in the room. The evidence established that the fan, which the defendant now claims was pointed at him in an attempt to extract his cooperation, was actually placed outside the room to help dissipate the cigarette smoke generated by the defendant. Moreover, although the defendant signed his second statement nearly twelve hours after his arrest, no evidence suggested that the police intentionally deprived him of sleep in order to coerce a statement from him. Finally, the defendant was informed that he had the right to counsel during the interrogation, and he specifically chose to waive his right to counsel. Thus, he may not now be heard to complain that his statement was the product of the deprivation of counsel. In our view, the totality of the circumstances supports the ruling of the trial court that the defendant's statements were voluntarily given.

### D. Effect of Illegal Arrest

Both at the suppression hearing and in his brief on appeal, the defendant appears to suggest that the State lacked probable cause for his arrest and that the resulting illegal arrest warranted dismissal of the case. Dismissal of the indictment, however, is not the proper remedy for an unlawful arrest. *See State v. Baker*, 966 S.W.2d 429, 432 (Tenn. Crim. App. 1997) (stating that "dismissal of the indictment is not . . . the proper remedy for an allegedly unlawful arrest"); *State v. Smith*, 787 S.W.2d 34, 35 (Tenn. Crim. App. 1989) ("Generally, an illegal arrest does not invalidate an indictment."); *Manier v. Henderson*, 442 S.W.2d 281, 282 (Tenn. Crim. App. 1969) ("The manner of arrest is immaterial to the validity of the indictment."); *Mullins v. State*, 380 S.W.2d 201, 202 (Tenn. 1964) ("Numerous cases are in the books and otherwise where defendants are prosecuted under indictments without being arrested prior to the return of the indictments; defendants are indicted after being released at a preliminary hearing; and in other cases defendants are prosecuted under indictments although the initial arrest was invalid." (emphasis added)). Instead, the appropriate remedy in the criminal justice arena for an illegal arrest is suppression of any evidence obtained as a direct or indirect result of the arrest. *See Baker*, 966 S.W.2d at 432 ("[T]he remedy for an illegal arrest typically is not dismissal of the indictment but that evidence seized as the result of an illegal arrest should be suppressed."); *Smith*, 787 S.W.2d at 35 ("Evidence seized as a result of an

illegal arrest is suppressed."). As indicated above, no constitutional basis exists for the suppression of either of the defendant's statements.

### E. Brady Violation

The defendant claims that the trial court should have suppressed his statements because the State withheld evidence prior to the suppression hearing. Specifically, the defendant argues that the State should have disclosed the substance of Lieutenant Young's testimony, noting that none of the discovery materials provided to him prior to the hearing included information that a citizen informant known to Lieutenant Young but who wished to remain anonymous had assisted in the identification of the defendant as the perpetrator, that the informant had provided the lieutenant with a photograph that was then shown to other officers but not preserved for the record, and that Lieutenant Young encouraged that person to call the information in to Crime Stoppers.

"It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (citing *United States v. Agurs*, 427 U.S. 97 (1976); *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Indeed, the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To establish a due process violation via the suppression of evidence, the defendant must establish that (1) he "requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not)," (2) "the State suppressed the information," (3) "the information was favorable to" his case, and (4) "the information was material." *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson*, 38 S.W.3d at 55-56 (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

> Although courts have used different terminologies to define "materiality," a majority of this Court has agreed, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*Ritchie*, 480 U.S. at 57 (citations omitted); *see also Bagley*, 473 U.S. at 682.

Even assuming solely for the sake of argument that *Brady* applies in the context of a hearing on a motion to suppress, the defendant cannot prevail upon his claim. Lieutenant Young's testimony was neither favorable to the defendant's case nor material to the case. Moreover, "no constitutional" provision "require[s] that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995).

## II. Testimony of Dontray Robertson

The defendant asserts that the trial court erred by permitting Mr. Robertson to testify about the two prior encounters between the defendant and the victim. The State avers that Mr. Robertson's testimony was properly admitted to establish the defendant's motive to kill the victim.

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). Before such evidence may be admitted, however, the following procedure must be followed:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

*Id.* When, as here, the trial court substantially complies with the procedural requirements of Rule 404(b), this court will overturn the trial court's ruling only when there has been an abuse of discretion. *See State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005).

Before beginning its proof, the State moved the court to rule upon the admissibility of Mr. Robertson's testimony. In the hearing on the State's motion, Mr. Robertson testified as he did at trial that the victim was living with Mr. Robertson at the time of his murder. Mr. Robertson said that, a couple of weeks before the murder, the victim told Mr. Robertson that he and the defendant were "going at it" "over a pizza and some female." Mr. Robertson spoke to the defendant and told him that he should disregard anything the victim said because the victim had mental health issues. A couple of weeks later, however, the defendant came to Mr. Robertson's house and threatened the victim "with a little .22 or something in his little hand." The victim alerted Mr. Robertson, and Mr. Robertson went outside and told the defendant that he "didn't need none of this," and the defendant "got in his car and took off."

At the conclusion of the hearing, the trial court found Mr. Robertson credible and found by clear and convincing evidence that the incidents had occurred. The court concluded that the evidence was admissible because it showed a settled purpose to harm the victim, premeditation, intent, and "the motive as to why this occurred on the date in question."

The trial court did not abuse its discretion by admitting Mr. Robertson's testimony. Evidence that the victim and the defendant had quarreled on two previous occasions and that the defendant held a gun during one of the quarrels was relevant to establish the defendant's motive for killing the victim and that he premeditated the victim's murder. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993) (affirming line of cases that held that "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim."). Additionally, the probative value of the evidence was not outweighed by the danger of unfair prejudice.

*III. Testimony of Ms. Patterson*

Citing *State v. Cureton*, 38 S.W.3d 64 (Tenn. Crim. App. 2000), the defendant asserts that he is entitled to a new trial because the State knowingly presented perjured testimony. Pointing to inconsistencies in Ms. Patterson's testimony and the statements she provided to the police and to Ms. Geiser, the defendant contends that the State knew Ms. Patterson's testimony was false but failed to correct the false testimony. The State contends that Ms. Patterson's testimony was not false.

The State's knowing use of false testimony implicates principles of due process. *See State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). Moreover, the State has an affirmative duty to correct false testimony, regardless of

whether it is solicited by the State or by the defendant. *See id.* at 617-18 (citations omitted). To obtain relief on such a claim, "the defendant must demonstrate that the State presented false testimony, the State knew the testimony was false, and the testimony was material." *State v. Cureton*, 38 S.W.3d 64, 74-75 (Tenn. Crim. App. 2000).

In this case, the defendant's claim fails on the threshold issue because no evidence suggests that the State presented false testimony. To be sure, parts of Ms. Patterson's direct examination testimony were inconsistent with the statement that she provided to Ms. Geiser and with other evidence at trial. During her direct examination in rebuttal, however, Ms. Patterson acknowledged the inconsistencies and explained that she was nervous when testifying initially. She also explained that she lied to Ms. Geiser because she was afraid of the defendant. Audio recordings of telephone conversations between the defendant and Ms. Patterson established that on the day that Ms. Patterson spoke to Ms. Geiser, the defendant warned her to remember what he had told her and not to cross him, he also threatened to send people to her house and to seek retribution against her upon his release. Finally, contrary to the defendant's assertion, Ms. Patterson's testimony that the defendant hid behind a tree before shooting the victim was not inconsistent with the physical evidence at trial. Under these circumstances, the defendant is not entitled to relief on this issue.

*IV. Rebuttal Evidence*

The defendant contends that the trial court erred by permitting the State to publish his statements during rebuttal, arguing that the statements did not actually rebut any proof offered by the defense during its case-in-chief. The State asserts that the trial court did not err because the defendant's statements were admissible to contradict the claim, presented via Ms. Geiser's recorded interview with Ms. Patterson, that the victim had fired at the defendant.

"Any competent evidence which explains or is a direct reply to, or a contradiction of, material evidence introduced by the accused, or which is brought out on his cross-examination is admissible in rebuttal." *Nease v. State*, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979). The decision to admit rebuttal evidence rests within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. Dellinger*, 79 S.W.3d 458, 488 (Tenn. 2002) (citing *State v. Kendricks*, 947 S.W.2d 875, 884 (Tenn. Crim. App. 1996)).

In our view, the trial court did not abuse its discretion by admitting either of the defendant's statements. During his case-in-chief, the defendant presented the

testimony of Ms. Geiser, who said that she interviewed Ms. Patterson at the end of June 2016 and that Ms. Patterson told her that the victim shot at the defendant before the defendant returned fire. Ms. Geiser also testified that Ms. Patterson denied having provided a statement to the police. The defendant exhibited to Ms. Geiser's testimony Ms. Patterson's audio recorded statement that the victim fired two shots at the defendant. The State presented the defendant's statements to the police to contradict Ms. Patterson's statement. In the first statement, the defendant claimed that a man named Hurt murdered the victim because the victim owed him money for marijuana and made no mention of the victim's having fired a gun at Hurt. In his second statement, the defendant admitted that he shot the victim after the victim "flashed a gun out" but did not, at any point, claim that the victim had fired first.

### V. Prosecutorial Misconduct

The defendant contends that the State engaged in prosecutorial misconduct by intentionally misstating the evidence during closing argument in an attempt to mislead the jury. He also asserts that the prosecutor's use of a diagram during closing argument improperly shifted the burden of proof. Finally, he claims that the State failed to disclose that it had offered Ms. Patterson a favorable plea agreement in exchange for her testimony and that she testified falsely that no such offer had been made.

As an initial matter, we note that the defendant did not lodge a contemporaneous objection to the prosecutor's use of either the diagram or the jail recording. Thus, to be entitled to relief, he must establish not only that the remarks were improper but also that they rose to the level of plain error. *State v. Gann*, 251 S.W.3d 446, 458 (Tenn. Crim. App. 2007). Moreover, the diagram was not included in the record on appeal, and the defendant has failed to specify which of the several recordings admitted into evidence was played by the prosecutor during closing argument. The defendant, as the appellant, bore the burden to prepare an adequate record for appellate review, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), and, in the absence of an adequate record, this court must presume the trial court's ruling was correct, *see State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Although the defendant attached the diagram to his appellate brief, this court may not consider any item not included in the record. *See State v. Matthews*, 805 S.W.2d 776, 783 (Tenn. Crim. App. 1990). In light of the incomplete record, we see no basis for noticing the error despite waiver. *See* Tenn. R. App. P. 36(b). Even assuming that the argument was improper, in light of the overwhelming evidence of the defendant's guilt, it would be harmless. In consequence, nothing suggests that "a substantial right of the accused [was] adversely affected" or that "consideration of the error is necessary to do substantial justice." *See State v. Smith*, 24 S.W.3d 274, 282, 283 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

As to the defendant's claim that the State engaged in prosecutorial misconduct by failing to disclose that it had offered Ms. Patterson a lenient sentence in exchange for her testimony against the defendant, we note that the claim is utterly unsupported by evidence from the record. First, the defendant claims that Ms. Patterson told him about the agreement in a letter, but he failed to produce the letter in the trial court, so it has not been included in the record on appeal. He has exhibited to his appellate brief documents purporting to establish that Ms. Patterson, who was originally charged with accessory after the fact, was eventually placed on judicial diversion following her plea of guilty to accessory after the fact. Again, this court may not consider any evidence not included in the trial record. Furthermore, even assuming that we could consider the documents, they do not support the defendant's assertion that Ms. Patterson received leniency *from the State in exchange for her testimony*. Judicial diversion is a largesse to be granted expressly at the discretion of the trial judge. *See* T.C.A. 40-35-313(a); *State v. King*, 432 S.W.3d 316, 326 (Tenn. 2014).

### *VI. Sufficiency*

The defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to establish the element of premeditation. The State contends that the evidence was sufficient.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and

intentional killing of another."  T.C.A. § 39-13-202 (2006).  As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment.  "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007).  Thus, when evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001).  Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

Here, the evidence adduced at trial established that the victim and the defendant had quarreled before the murder.  On the day of the murder, the defendant and Ms. Patterson drove around in Ms. Patterson's silver Cadillac.  At one point, the defendant went into a residence near his mother's and returned to the car with a shotgun wrapped in blue tape.  Later, Ms. Patterson overheard the defendant discussing murdering someone.  She asked him to drive her home, and, as they drove toward her residence, the defendant said, "[T]here he go right there."  The defendant turned the car around, parked near an abandoned house, and got out of the car with the shotgun.  Ms. Patterson heard two gunshots, and the defendant admitted to police that he shot the victim twice, saying that he wanted to teach the victim a lesson.  The unarmed victim was shot twice at close range with the same 12-gauge shotgun later recovered from Ms. Patterson's car.  One shot blew away nearly half of the victim's face.  After shooting the victim, the defendant returned to his mother's house, where he changed clothes before returning to the scene of the crime.  At the scene, the defendant caused a disturbance by trying to enter the crime

-24-

scene. This evidence more than sufficiently established that the defendant acted with premeditation when he intentionally killed the victim.

## VII. Cumulative Error

Finally, the defendant asserts that the cumulative effect of the errors deprived him of his constitutional rights to due process and a fair trial. Having considered the issues presented on appeal and having concluded that the defendant is not entitled to relief for any, we need not consider the cumulative effect of the alleged errors. *See State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

## VIII. Conclusion

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE